Estate of Lemon L. Smith, deceased, The Chase Manhattan Bank, Claire Loring Smith and Henry J. Varner, Executors v. Commissioner.
Estate of Smith v. Commissioner
Docket No. 79622.
United States Tax Court
T.C. Memo 1961-242; 1961 Tax Ct. Memo LEXIS 107; 20 T.C.M. (CCH) 1268; T.C.M. (RIA) 61242; August 29, 1961
Benjamin Hinchman III, Esq., 223 Levergood St., Johnstown, Pa., for the petitioners. *108 Donald W. Howser, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency of $65,115.29 in the estate tax of the petitioner. The only issue is whether the petitioner is entitled to a charitable deduction in the amount of the value of a bequest by Lemon L. Smith, the decedent, for the use of the Lemon L. Smith Clinic. Findings of Fact Lemon L. Smith, hereinafter referred to as the decedent, died suddenly on November 23, 1954. The estate tax return was filed with the district director of internal revenue in Pittsburgh, Pennsylvania. The decedent's will, dated November 20, 1951, a codicil dated July 28, 1953, and a second codicil dated July 29, 1953, were admitted to probate and letters testamentary were granted. The will and the codicils were prepared by the decedent himself. The will provided as follows: SIXTH: I direct that my executors pay the remainder of my estate into a Trust Fund to be known as the Lemon L. Smith Clinic Trust Fund, of which The Chase National Bank of the City of New York and my cousin, Mary E. Varner shall be the Trustees and from which all the income shall *109 be distributed quarterly as follows: (a) 15% to the Lemon L. Smith Clinic, hereinafter designated the Clinic. [Various percentages of income to relatives and employees for life and thereafter to the Lemon L. Smith Clinic.] The trust created hereby for the benefit of the Lemon L. Smith Clinic, a corporation which I am about to form, shall endure in perpetuity and in the event that I shall not have formed said Clinic at the time of my death, I direct that my wife, Claire Loring Smith and Dr. R. R. Snowden of the Pittsburgh Diagnostic Clinic are hereby empowered to organize a nonprofit corporation to operate a Clinic in the manner I have outlined to them. The term "Lemon L. Smith Clinic" as used herein shall also include any successor to said Clinic by merger, consolidation or otherwise. The other residuary beneficiaries were to receive life estates and upon their deaths their share of the income was to be paid to the Lemon L. Smith Clinic. The codicil of July 28, 1953, insofar as here relevant, provided that the following was to be substituted for paragraph "Sixth": SIXTH: I direct that my executors pay the remainder of my estate into a Trust Fund to be known as the Lemon *110 L. Smith Clinic Trust Fund, of which the Chase National Bank of the City of New York and my cousin Henry Varner shall be the Trustees and from which all the income shall be distributed quarterly as follows: (a) 15% to the Lemon L. Smith Clinic, hereinafter designated the Clinic. [Various percentages of income to relatives for life, in revised amounts, and thereafter to the Lemon L. Smith Clinic.] The paragraph contained in the will relating to the formation of the Lemon L. Smith Clinic was not repeated in this codicil. The corporation referred to in the will was not formed prior to the decedent's death. The codicil of July 29, 1953, in the form of a letter to the decedent's executors and trustees revised the distribution to be made on account of one of the individual beneficiaries. In 1945, 1947 and 1949 the decedent had had physical examinations at the Pittsburgh Diagnostic Clinic in Pittsburgh and was greatly impressed with the type and manner of medical service offered by that clinic. The decedent wanted to establish this type of medical clinic for his own community of Johnstown which was "a sort of poor section." The decedent expressed his intention to Dr. R. R. *111 Snowden, the medical director of the Pittsburgh Clinic and stated that he intended to finance one in Johnstown "in a small way to start, and when I pass on it would receive a very sizeable endowment." Decedent wrote to Dr. Snowden on October 24, 1951, as follows: I would appreciate it very much if you would take time to give me an outline as to how your Clinic is set up. Is it endowed to any extent? Is it directed by a Board of Directors? Do you do any charity work and how near do your fees come to covering the operating expenses? Do you receive any State appropriations? What, in your opinion, would be the cost for equipment to start in a limited way? I presume you have on the Staff just one doctor for each specialized line of medicine. Are the fees to each doctor uniform or do some receive a larger fee than others? * * *
Dr. Snowden did not have a copy of his reply and the reply is not in evidence. Considerable time was spent by the decedent in drawing tentative building plans for the clinic and having almost daily discussions as to its purpose and operation with his wife. It was contemplated by the decedent that the clinic be built on a portion of 5 acres of the land on *112 which decedent's residence was located, and that the building was to have an arrangement similar to that of the Pittsburgh Diagnostic Clinic quarters. It was also proposed that contrary to the Pittsburgh Clinic, the Lemon L. Smith Clinic would have no fixed or minimum charge and that a research laboratory be available free of charge for use by young doctors who lacked the funds for experienting; and that loans or gifts of clinic funds could be made for the purpose of research. The Pittsburgh Clinic is a stock corporation, but it does not pay dividends and is operated with a purpose of not earning enough to pay any dividends. The patients pay a standard charge for a complete examination. Dr. Snowden and several heads of departments are paid nominal salaries. The doctors who are specialists in their fields, engage in their own practice and receive modest fees for their services at the clinic. These doctors have not increased their fees during the past inflationary economic periods. They now "practically contribute their services." William A. Crichley of Cleveland, Ohio is an active member of the board of directors of the Pittsburgh Clinic, and is "very much interested in the clinic *113 as a philanthropist." The Pittsburgh Clinic maintains the facilities for the doctors to use in this phase of their medical practice. The decedent's widow, Claire, knew the terms of the will. She had been instructed by the decedent to carry out his plans for the clinic should he die before he had established it. She was to consult Dr. Snowden about the administrative organization of the clinic. The Lemon L. Smith Clinic was incorporated by Claire, Mary Snowden who was decedent's secretary for over 20 years, and is not related to Dr. Snowden, Paul H. Ramsey, a co-executor, Raymond M. Smith of Johnstown, Pennsylvania, and Benjamin Hinchman III, attorney for accounts for the estate. It was incorporated on a nonstock basis under the "Nonprofit Corporation Law" of Pennsylvania on October 10, 1955, about 11 months after the death of the decedent. Dr. Snowden did not have the time actively to participate in the incorporation of the clinic. Paragraph 3 of the Articles of Incorporation is as follows: 3. The purpose or purposes of the corporation are: to maintain and carry on hospital and clinic facilities for the diagnosis and treatment of human diseases and disorders, provided, however, *114 that all diagnosis and treatment shall be limited to properly qualified and duly licensed physicians and surgeons. and that this corporation does not contemplate pecuniary gain or profit, incident or otherwise, to its members. * * *
The Clinic's By-laws, adopted January 11, 1956 provide: * * *
Section 1. The purpose of this corporation is to maintain and carry on a medical and surgical clinic, laboratories and other facilities for the investigation, diagnosis and treatment of human diseases and disorders. * * *
The small amount of the current income from the trust had delayed carrying out the terms of the will and the immediate establishment of the medical clinic. Limited service was effected by the establishment and operation of a nuclear medicine clinic facility under an agreement dated January 26, 1959 between the Lemon L. Smith Clinic and the Lee Hospital in Johnstown, also a non-profit Pennsylvania corporation. The agreement was made in order that the "needs of the community will be greatly benefited by the establishment of clinical facilities employing the use of radioisotopes and/or other fissionable material." The Lemon L. Smith Clinic agreed to pay over *115 to the hospital, solely for this purpose, $10,000 out of about $13,000 accumulated in cash and thereafter all of the income which it received, except $300, or less, which it reserved for its own administrative expenses. The hospital agreed to provide qualified medical personnel to staff the facilities and supplement the income it received from the clinic, if necessary. The agreement ran for five years with provisions for its earlier termination in three years at the option of either party, or its extension. The stipulated facts are found as stipulated. The bequest was for the use of the Lemon L. Smith Clinic which was organized and operated exclusively for charitable or scientific purposes. No part of the funds of the clinic is used for influencing legislation and no part of its net earnings inures to the benefit of any individual. The Commissioner in his notice of deficiency disallowed the deduction of the value of this bequest in determining the decedent's taxable estate. Opinion We are confronted with the question of whether the value of the bequest to a trust fund created in decedent's will for the benefit of the Lemon L. Smith Clinic is deductible from the decedent's *116 gross estate under section 2055(a)(2) of the Internal Revenue Code of 1954. [1] The parties are agreed that they can compute the amount of the deduction under Rule 50 if our decision makes such a computation necessary. The Commissioner's position is that the Lemon L. Smith Clinic was not organized to operate exclusively for charitable or scientific purposes, with no part of its net earnings inuring to the benefit of any individual. He and the petitioner appear to agree that the bequest was, in the *117 terms of the statute "for the use of * * * [a] corporation", but the Commissioner denies that the corporation qualified for the above stated reasons. The decedent had had several physical, diagnostic examinations at the Pittsburgh Diagnostic Clinic. He was much impressed with the benefit and service it afforded, and thought that it would be an excellent accomplishment if such help could be made available for the people of his immediate part of the state. He tentatively explored with Dr. Snowden, the medical director of the Pittsburgh Clinic, the possibilities of establishing such a clinic in Johnstown. He inquired as to the details of the operation of the Pittsburgh Clinic, seeking information on such matters as how much it charged; whether the fees covered operating expenses; whether all of the doctors received the same fees; whether it did charity work; whether it had an endowment; and whether it received appropriations from the state. The decedent continued his inquiries and over a period of years planned and discussed the clinic and its operation with his wife. His suddent death probably prevented him from using available cash to make the initial start of the clinic. Whatever *118 might have been the status of the Pittsburgh Clinic and whatever might have been his information about it we read the record here as showing that the decedent was patterning his proposed clinic after it to the extent of the nature of the physical plant and types of service. He went further however than the practical non-profit character of that operation. He anticipated that his clinic would meet the needs of a relatively poor section of the state and would enable experimenting young doctors to have the free use of its facilities. All of these things he had talked over with his wife and Dr. Snowden, both of whom testified in detail as to his plans and intentions. Paragraph sixth of his original will specifically designated them to carry out his ideas. In the codicil of July 28, 1953 this designation of his widow and Dr. Snowden was not repeated. However, no possible way could be opened to the trustees to carry out the intent of the decedent except to ascertain from such sources as the decedent's wife and Dr. Snowden the nature of the clinic to be established. As we said in Houston Land & Trust Co., Trustee, 33 B.T.A. 73, 77 and 78, the intention of the testator is paramount *119 and resort may be had to clarifying oral testimony of parties with whom the testator had discussed what he wanted his will to accomplish. Moreover, the will and codicils were written by the decedent himself and any possible defects of drafting or nomenclature should not be used to defeat his obvious intent. This intent is manifested by the will and codicil and the testimony of decedent's wife and Dr. Snowden [2] as to the conversation and communications in which decedent set forth his plans and purposes. With her mind full of her husband's wishes in the matter, the decedent's widow, together with decedent's other executor and associates, within about 11 months of his death took steps formally to carry out the decedent's intentions and chartered the Lemon L. Smith Clinic. The charter was for a non-profit corporation and in a statement of the purpose contained in the charter and in the by-laws it was envisaged that the clinic would be maintained for diagnostic treatment *120 of human diseases and make laboratories and other facilities available for investigation or research to advance such purposes. The provision in the will for income to life beneficiaries prevented very substantial sums of money from becoming available for the clinic in the years just after the decedent's death. These limited funds, however, were channeled into a purpose compatible with the decedent's plans. Through the agreement with Lee Hospital clinic facilities using radioisotopes and other fissionable material were made available for the diagnosis and treatment of patients. The Lee Hospital of Johnstown is also a non-profit corporation and it is published in the Treasury Department Cumulative List (1958) (p. 160) of organizations exempt from tax under section 170(c) of the 1954 Code. [3] The hospital was going to provide the qualified personnel to staff the facilities, and undertook to make up any deficiencies occasioned by the operation of facilities in order that they could be continued. The Lemon L. Smith Clinic made an initial payment of $10,000 and undertook to turn over to Lee Hospital practically all of its annual income. Insofar as the Lemon L. Smith Clinic is concerned, *121 it is giving the funds to cover whatever deficit occurs in the operation of a public health l service to the extent of practically all of its income. In addition it had given most all of its accumulated income to establish the facility. The Lemon L. Smith Clinic was never to make a profit. Under the foregoing circumstances we conclude that the Lemon L. Smith Clinic is a corporation organized and operated exclusively for charitable or scientific purposes. The Commissioner argues that the record does not support the conclusion that we have reached and that merely because a corporation is a "nonprofit" corporation does not qualify the bequest "for the use of it" as a deduction from the gross estate under section 2055(a)(2). Hise position is that the Lemon L. Smith Clinic was to be used by a limited group of doctors for their private practice of medicine and entirely for their own profit. We have indicated that, contrary to the Commissioner's view, the record establishes an exclusively charitable or scientific purpose to give the petitioner's relatively poor community additional modern medical service. The fact *122 that the Clinic is organized under a non-profit corporation statute rather than, for example, under a state statute for incorporation of non-sectarian charitable institutions neither establishes nor defeats the petitioner's position. See, a fortiori, Commissioner v. Battle Creek (C.A. 5), 126 F. 2d 405, affirming a Memorandum Opinion of this Court, where the corporation was organized under general corporations for profit laws, and the charitable status was recognized, and the cases relied upon by the Commissioner to support this view [4] are distinguishable, primarily by reason of the fact that here the decedent, the trust and the clinic are third-party, outside, non-participating interests with a donative intent to be a benefactor to the community. None of them was engaged in business; and the clinic corporation, as we have found in our ultimate findings of fact, was organized and operated exclusively for charitable or scientific purposes. The Commissioner's further argument that the possibility that the doctors using the facilities might charge fees which would in effect reflect some value for the use of the facilities has no merit. The connection is much too remote *123 in this instance. From the entire record we believe that the fund used to establish the Lemon L. Smith Clinic was a contribution deductible under section 2055 of the 1954 Code. According to the agreement of the parties. Decision will be entered under Rule 50. Footnotes
1. SEC. 2055. TRANSFERS FOR PUBLIC, CHARITABLE, AND RELIGIOUS USES. (a) In General. - For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers * * *
(2) to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private stockholder or individual * * *;↩
2. The decedent's secretary for 20 years was a witness at the trial whose testimony was to be for the purpose of corroboration, but was not heard on this matter because the testimony of Claire stood uncontradicted.↩
3. Comparable in its requirements to section 2055↩ here involved.
4. Lorain Avenue Clinic (1958), 31 T.C. 141; Medical Diagnostic Association (1940), 42 B.T.A. 610; John Joseph Cranley, Jr., T.C. Memo. 1961-4; Fort Scott Clinic & Hospital Corp. v. Brodrick (D.C. Kan. 1951) 99 F. Supp. 515; Gund's Estate v. Commissioner (C.A. 6, 1940), 113 F. 2d 61, cert. den. 311 U.S. 696; United States v. Community Services (C.A. 4, 1951), 189 F. 2d 421, cert. den. 342 U.S. 932; Better Business Bureau v. United States (1945) 326 U.S. 279; Cf. Allison v. Mennonite Publications Board (W.D. Pa. 1954), 123 F. Supp. 23↩.